[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-11951

_____

D. C. Docket No. 04-00033-CV-HL-6
BKCY No. 02-60546-BKC-JTL

In Re:

RICKY WAYNE BRACEWELL,

Debtor.

--------------------------------------------------

RICKY WAYNE BRACEWELL,

Plaintiff-Appellee,

versus

WALTER W. KELLEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(June 30, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

CARNES, Circuit Judge:

This is an appeal by the trustee of the bankruptcy estate of Ricky Bracewell from an order of the district court excluding from the estate a payment Bracewell received under the Agricultural Assistance Act of 2003 for crop losses he had sustained. The appeal turns on the issue of whether a crop disaster payment is property of the debtor's estate under 11 U.S.C. § 541(a)(1) or (a)(6) if the losses occurred before the bankruptcy filing or conversion date but the legislation authorizing the payment came afterwards. The bankruptcy court ruled that the payments were property of the estate under § 541(a)(1) but not under (a)(6). On Bracewell's appeal, the district court ruled that the payment was not property of the bankruptcy estate under either subsection of § 541. This is the trustee's appeal from that ruling.

## I.

The facts have been stipulated throughout these proceedings. Ricky Bracewell planted approximately 223 acres of seed wheat in November 2000 and approximately 374 acres of seed cotton in May 2001. A drought in 2001 substantially reduced Bracewell's crop yields. As a result, he was unable to repay the debts he had incurred to produce the crops. Bracewell filed a Chapter 12

2

bankruptcy petition on May 29, 2002, and he converted it to a Chapter 7 case on January 2, 2003.

In July 2002, while Bracewell's bankruptcy petition was pending, the Emergency Farmer and Rancher Assistance Act of 2002 was introduced in the House of Representatives. H.R. 5310, 107th Cong. (2002). That proposed legislation was not enacted. In January 2003, after Bracewell had converted his bankruptcy case to chapter 7, Congress reconvened and the legislation was reintroduced as The Agricultural Assistance Act of 2003. H.R.J. Res. 2, 108th Cong. (2003). The Act was signed into law on February 20, 2003. Agricultural Assistance Act of 2003, Pub. L. No. 108-7, div. N, tit. II, 117 Stat. 538 (2003). It provided for monetary assistance to farmers who had suffered losses to their 2001 or 2002 crops due to weather-related disasters or emergency conditions. Id. § 202(a), 117 Stat. at 538. Under the Act farmers who had suffered losses to both their 2001 and 2002 crops could receive assistance for only one year's loss, the year to be selected by each farmer. Id. § 202(c), 117 Stat. at 538. On January 30, 2004, Bracewell applied to the Department of Agriculture's Farm Service Agency for a payment as a result of the losses he had suffered to his 2001 wheat and cotton crops. He received that payment, in the amount of $41,566, on February 19, 2004, while his Chapter 7 case was still pending in the bankruptcy court.

3

## II.

### A.

We begin our legal discussion by taking up the question of whether the crop disaster payment to Bracewell is property of the bankruptcy estate under § 541(a)(1), which is an issue of first impression in this circuit. Section 541(a)(1) defines property of the bankruptcy estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The plain language of that provision is clear, and it makes the commencement of the bankruptcy case the key date for property definition purposes.[1] That means the property of the debtor's estate is property the debtor had when the bankruptcy case commences, not property he acquires thereafter. Our most closely analagous decision, as well as the only two courts of appeals decisions that are directly on

---

[1] There is one wrinkle in cases, like the present one, which began as Chapter 12 proceedings but were converted to Chapter 7. Section 1207(a) of the Bankruptcy Code, which applies to Chapter 12 cases, expands the definition of property of the estate to include: "all property of the kind specified in such section [§ 541] that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of this title . . . ." 11 U.S.C. § 1207(a)(1). The practical effect of that expansion in the temporal limitation is to move the cutoff date for the acquisition of property from the filing of the bankruptcy case to the time it is converted under Chapter 7. In the present case that provision makes no difference because Bracewell's crop losses occurred before his bankruptcy petition was filed, and Congress' enactment of the legislation authorizing payments occurred not only after Bracewell's petition was filed but also after he converted it to a Chapter 7 proceeding. Probably for that reason, the parties do not mention § 1207(a)(1) but instead stake their positions regarding this issue on § 541(a)(1). We will focus our discussion on § 541(a)(1) as well.

4

point, confirm that the clear temporal limitation which is so plain on the face of the statutory language controls.

The specific issue in <u>Witko v. Menotte (In re Witko)</u>, 374 F.3d 1040 (11th Cir. 2004), was whether a legal malpractice claim was property of the estate. <u>Id.</u> at 1042. After Witko filed a petition for bankruptcy, he was denied alimony in a separate legal proceeding. <u>Id.</u> at 1042. Thereafter, and while his bankruptcy case was still pending, Witko sued his divorce counsel for malpractice. <u>Id.</u> The trustee intervened, seeking a determination that Witko's malpractice claim was property of the estate. <u>Id.</u> We held that it was not, because a debtor's estate cannot be greater than the property rights the debtor had at the commencement of the case. <u>See id.</u> at 1042–43. We reasoned that: "Applying the appropriate state law, Witko's legal malpractice cause of action did not exist until his alimony action concluded with an adverse outcome that was proximately caused by his attorney's negligence," <u>id.</u> at 1043, and that outcome did not happen until after the commencement of the bankruptcy case. <u>Id.</u> at 1044. As a result, the property interest in the malpractice claim did not come into existence until after the bankruptcy case had already commenced. <u>Id.</u> The same is true here. Bracewell's property interest in a claim to payments under the Agricultural Assistance Act of 2003 did not come into

existence or accrue until that legislation became law, which was after his bankruptcy petition had been filed.

The two federal appeals court decisions directly on point are Drewes v. Vote (In re Vote), 276 F.3d 1024 (8th Cir. 2002), and Burgess v. Sikes (In re Burgess), 438 F.3d 493 (5th Cir. 2006) (en banc). In the Eighth Circuit case the debtor, Vote, filed a bankruptcy petition on September 7, 1999, which was six weeks before legislation was passed providing payments for crop losses suffered during 1999. Vote, 276 F.3d at 1026. Thereafter, Vote received more than $33,000 under that legislation because he had not been able to plant a crop in 1999. Id. The Eighth Circuit held that the payments were not "legal or equitable interests of the debtor in property as of the commencement of the case" within the meaning of § 541(a)(1). Id. at 1027. It reasoned that to include the payments in the estate would give the trustee rights beyond those that Vote had at the commencement of the case, because Vote "had no interest of any kind" until the assistance legislation became law. Id.

The Fifth Circuit, sitting en banc, has also recently addressed this precise issue. The Burgess case involved disaster payments under the Agricultural Assistance Act of 2003, the same legislation involved in this case. See Burgess, 438 F.3d at 495. The only factual difference from this case is that Burgess had

6

received a discharge from bankruptcy before the legislation was enacted.  See id.

The trustee filed a motion to re-open.  Id.  The Fifth Circuit held that the case

should not be re-opened because the assistance payments were not property of the

estate.  Id. at 496.  It began with the proposition that only property "'in which the

debtor has a legal or equitable interest at the time of bankruptcy comes into the

estate.'"  Id. at 499 (quoting Goff v. Taylor (In re Goff), 706 F.2d 574, 578 (5th

Cir. 1983) (quotation marks omitted), overruled on other grounds by Patterson v.

Shumate, 504 U.S. 753, 112 S. Ct. 2242 (1992)).  The debtor did not have a legal

or equitable interest in crop loss payments under legislation that had not been

enacted at the time he filed his bankruptcy petition.  Id. at 503.  He had only a

"mere hope" that legislation would be enacted providing payments to cover his

crop loss.  Id.  If a hope at the time of filing were enough, the Court explained,

"any postpetition legislation or contract could retroactively create property of the

estate."  Id.  The Burgess court also held that the crop loss itself was not property

of the estate which would bring in the disaster payment as proceeds.  Id.  If the fact

that the crop loss preceded the filing were enough by itself, the language of §

541(a)(1) —"a legal or equitable interest as of the commencement of the

case"—would have no effect.  Id.  There can be no legal or equitable interest in

payment without law authorizing it, and at the time of filing that law did not exist. See id.

The Ninth Circuit's decision in Sliney v. Battley (In re Schmitz), 270 F.3d 1254 (9th Cir. 2001), is in accord with these decisions although Schmitz presented a slightly different question. After the filing of his bankruptcy petition, Schmitz was awarded a fishing quota or right for future years. Id. at 1255. The quota was calculated based on Schmitz's pre-filing fishing history. Id. The Ninth Circuit held that the quota rights were not part of the bankruptcy estate because the regulations creating those rights were not adopted until after the bankruptcy petition was filed. Id. at 1257–58. Even though the quota was calculated based on Schmitz's pre-filing fishing history, that history had no value until the regulations were promulgated. Id. at 1257. At the time he filed, Schmitz had nothing beyond the hope based on his interest. Id.

Thus, the circuits that have considered the issue are in agreement that no legal or equitable interest exists until assistance legislation becomes law; before then the debtor has only a hope and maybe an expectation that legislation will be enacted for his relief, but that is not enough. See In re Schmitz, 270 F.3d at 1257 (holding that "a hope, a wish and a prayer" is insufficient under § 541(a)(1)). We join the other circuits and conclude that until legislation was enacted authorizing

8

the disaster payments and specifying the criteria for those payments, Bracewell had no legal or equitable interest in a payment. This is true even though before he filed his case he satisfied the criteria for payment that, as it turns out, Congress would eventually require. The fact that Congress regularly enacts this type of legislation did not give Bracewell any legal or equitable interest in the payment he would receive if Congress acted as it had in the past. "If" is a big word. Cf. Barnette v. Evans, 673 F.2d 1250, 1252 (11th Cir. 1982) (rejecting the rationale of a bankruptcy court that we characterized as: "if we had some ham, we could have ham and eggs, if we had some eggs").

Not until the enactment of the legislation elevated Bracewell's hope to an entitlement did it become an interest cognizable under § 541(a)(1). As the district court explained in its opinion in this case:

> Without the crop disaster legislation, growing crops and suffering crop loss—no matter how sufficiently rooted to the pre-bankruptcy past—are of no legal significance and create no right. This is why the bankruptcy court's statement, "Upon the occurrence of the disaster, [Appellant] had the right to collect disaster payments from the government, if such legislation [were] passed," employs circular reasoning. Indeed, it is the crop disaster legislation that makes growing and suffering certain crop losses relevant by attaching new legal consequences to events completed before the legislation's enactment.

Bracewell v. Kelley (In re Bracewell), 322 B.R. 698, 707 (M.D. Ga. 2005).

9

Our conclusion that a debtor has no cognizable interest in a payment that Congress has not yet authorized through legislation is also in accord with most of the bankruptcy courts that have considered the issue. Cf. Boyett v. Moore (In re Boyett), 250 B.R. 817, 822 (Bankr. S.D. Ga. 2000); Drewes v. Lesmeister (In re Lesmeister), 242 B.R. 920, 925 (Bankr. D.N.D. 1999). We are aware that Lemos v. Rakozy (In re Lemos), 243 B.R. 96 (Bankr. D. Idaho 1999), is to the contrary but do not find that court's reasoning to be persuasive, a sentiment that is apparently now shared by the very court that issued the decision. See In re Stallings, 290 B.R. 777, 781 (D. Idaho 2003) (noting that "the legal landscape has changed" since the Lemos decision was issued).

The existence of § 1207, which we noted in passing earlier in this opinion, see p.7 n.1, above, provides an additional reason for concluding that § 541(a)(1)'s language defining property interests of the estate as those that existed "as of the commencement of the case" clearly is a temporal limitation. Congress enacted Chapter 12 of the Bankruptcy Code, the chapter under which Bracewell originally filed for bankruptcy, in 1986. Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, § 255, 100 Stat. 3088 (Oct. 27, 1986). Section 1207 expands, for cases falling under it, the definition of property of the estate under § 541 to include "all property of the kind specified in

10

such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of this title, whichever occurs first." 11 U.S.C. § 1207(a)(1). If § 541(a)(1) did not generally limit the property of the estate to that which existed at the time of filing, there would be no reason for § 1207(a)(1) to extend the cutoff point to the earlier of the closing, dismissal, or conversion date in Chapter 12 cases. Reading § 541(a)(1) the way the trustee and our dissenting colleague urge would render § 1207(a)(1) largely superfluous, and statutes ought to be read so that every provision has a purpose and field of operation. See, e.g., TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotation marks omitted); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149 (1992) ("[C]ourts should disfavor interpretations of statutes that render language superfluous."); Bouchar Transp. Co. v. Updegraff, 147 F.3d 1344, 1351 (11th Cir. 1998) ("[W]e avoid statutory constructions that render provisions meaningless.").

B.

The dissenting opinion in this case follows the tracks of the Burgess dissenters and joins them on what is essentially one long, forced march against the plain language that governs the issue. Congress said "property as of the commencement of the case," 11 U.S.C. § 541(a)(1), and that is the language we must apply. The Burgess dissenters contended that § 541(a)(1) and (6) are "sufficiently broad to encompass the disaster payments." Burgess, 438 F.3d at 508 (Jones, C.J., dissenting). Their argument was that the purposes of bankruptcy require a "comprehensive administration of the debtor's property," which justifies a broad reading of § 541. Id. at 509. A broad reading is one thing; a reading contrary to the plain meaning of clear statutory language is another. Our dissenting colleague, like the dissenters in Burgess, would read § 541(a)(1)'s plain statutory language "as of the commencement of the case" so "broadly" that it no longer means "as of the commencement of the case." We do not question their good faith or the sincerity of their belief that construing the language as they do would better further what they see as the purposes of the Bankruptcy Code and their notion of good policy. We do, however, disagree with the implicit premise of their position:  that it is the function of judges to modify legislative language to

12

better suit what they perceive to be Congress' purposes and the felt necessities of their policy views.

The Supreme Court and this Court have warned on countless occasions against judges "improving" plain statutory language in order to better carry out what they perceive to be the legislative purposes. See, e.g., Lamie v. U.S. Trustee, 540 U.S. 526, 538, 124 S. Ct. 1023, 1032 (2004) ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding. It results from deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.") (internal quotation marks omitted); Artuz v. Bennett, 531 U.S. 4, 10, 121 S. Ct. 361, 365 (2000) ("Whatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them. . . . [T]he text . . . may, for all we know, have slighted policy concerns on one or the other side of the issue as part of the legislative compromise that enabled the law to be enacted."); Conn. Nat'l Bank, 503 U.S. at 254, 112 S. Ct. at 1149 ("When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") (internal quotation marks omitted); Badaracco v. Comm'r of Internal Revenue, 464 U.S. 386, 398, 104 S. Ct. 756, 764 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects

13

susceptible of improvement."); <u>Wright v. Sec'y for Dept. of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002) ("Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them."); <u>Harris v. Garner</u>, 216 F.3d 970, 976 (11th Cir. 2000) (en banc)  ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to apply statutory language, not to rewrite it.").

If, in the face of plain statutory language, an opinion runs on about purposes and policies, it is a sure sign the revision knife is out and an effort is being made to slice and dice clear language to make way for the policy preferences of the writer. It justifies Justice Scalia's recent criticism that talk about "advancing 'the purpose of the Act'" is the "last resort of extravagant interpretation." <u>Rapanos v. United States</u>, __ U.S. __, __ S. Ct. __, 2006 WL 1667087, at *21 (June 19, 2006) (plurality opinion).  As he explained, it is an approach that runs counter to the truth "that no law pursues its purpose at all costs, and that the textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." <u>Id.</u>  The dissenting opinion in this case refines the extravagant interpretation approach by suggesting that the statutory language "property as of the commencement of the case" is ambiguous as to whether it covers an interest

14

created by a pre-petition crop loss. We disagree. The language is perfectly clear. It covers exactly what it says it covers, which are any interests that are "property as of the commencement of the case" and none that are not. If an interest is not property on the date a case is filed, it is not covered.

The Burgess dissenters relied primarily on two Supreme Court decisions, Segal v. Rochelle, 382 U.S. 375, 86 S. Ct. 511 (1966), and United States v. Whiting Pools, 462 U.S. 198, 103 S. Ct. 2309 (1983), both of which are readily distinguishable. In Segal the Supreme Court held that certain loss-carryback tax refunds were property of the bankruptcy estate. 382 U.S. at 380, 86 S. Ct. at 515. The debtors argued that the refunds were not property of the estate because, although the losses entitling them to the refunds were suffered before they filed their bankruptcy petitions, under the statutory scheme no refunds could be claimed until the end of the year. Id. at 380, 86 S. Ct. at 515. According to the Court, the purposes of the Bankruptcy Act, rather than a particular federal or state definition, would ultimately determine whether any particular item constituted property of the estate. Id. at 379, 86 S. Ct. at 515. The Court noted that "property" of the bankruptcy estate should be broadly construed and that "an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." Id. The Court ultimately held that the refund claim was "sufficiently

15

rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property.'" Id. at 380, 86 S. Ct. at 515. According to the Burgess dissent, Segal means that a loss as of the date of bankruptcy "can later yield property includable in the debtor's estate." Burgess, 438 F.3d at 511.

The Segal decision cannot mean what the Burgess dissenters say it does about the present Bankruptcy Code, because Segal was decided twelve years before Congress overhauled the Bankruptcy Code in 1978. It was during that overhaul that Congress added the critical language of § 541(a)(1), restricting property of the estate to that which existed "as of the commencement of the case." See DirecTV, Inc. v. Brown, 371 F.3d 814, 817 (11th Cir. 2004) ("[C]hanges in statutory language generally indicate an intent of Congress to change the meaning of the statute.") (internal quotation marks, alterations, and citations omitted); Muscogee Nation v. Hodel, 851 F.2d 1239, 1444 (D.C. Cir. 1988) ("Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."). The § 541(a)(1) definition, with its explicit temporal limitation, controls our analysis rather than Segal's test. See Burgess, 438 F.3d at 498 ("Segal's 'sufficiently rooted' test did not survive the enactment of the Bankruptcy Code."); In re Vote,

16

276 F.3d at 1026 ("To find for the trustee on the basis that the payments were 'sufficiently rooted' would allow the trustee to assert more rights than Vote had at the commencement of his case. The legislative history of the 1978 Bankruptcy Code makes clear that despite the broad scope of § 541, it is not intended to [expand] the debtor's rights against others more than they exist at the commencement of the case.") (internal quotation marks omitted). The Segal decision told us how to define property under the old bankruptcy code, before it was amended in 1978 to include an explicit definition of property. We will not attribute to the Supreme Court an intent to construe legislative language that it had not seen and which would not even exist for another dozen years.

Our dissenting colleague relies on the Segal decision, as did the Burgess dissenters, and we think that his reliance is misplaced for the same reasons theirs was. He does add another component to the argument about Segal. In support of the proposition that Segal's "sufficiently rooted" test should be allowed to trump the later-enacted, plain language of § 541(a)(1), he cites our decision in In re Alvarez, 224 F.3d 1273 (11th Cir. 2000). In that case, as in our Witko decision, we had to determine whether the debtor's legal malpractice action was part of the bankruptcy estate. Id. at 1275. We held that it was. Id. at 1278. The basis for the legal malpractice action was the filing of the bankruptcy case itself. Id. at 1275.

The debtor had instructed his attorney to file a Chapter 11 reorganization petition on his behalf, but that attorney filed a Chapter 7 petition instead. Id.

We began our analysis in Alvarez by examining the legal malpractice claim, looking to its elements under Florida law to determine exactly when the cause of action accrued. Id. at 1276–77. We determined that the cause of action had accrued under state law at the moment Alvarez's bankruptcy petition was filed and, therefore, concluded that Alvarez had a cause of action "as of the commencement" of his bankruptcy case which was property of the estate under § 541(a)(1). Id. at 1278. This is precisely the same analysis which we later applied in the Witko case and it is not dependent at all on the Segal "sufficiently rooted" analysis. See Witko, 374 F.3d at 1042–43. This is the holding of Alvarez and the analysis that we are bound to follow: we look to state law to determine when a claim arises, and if it arises on or before the commencement of the bankruptcy case, it is part of the bankruptcy estate.

The dissent has been led astray by some superfluous language in Alvarez which was not necessary to its holding. The Alvarez opinion says that it is not deciding if federal or state law governs the question of whether the malpractice action was property of the estate, because under either approach the claim was property of the estate. Alvarez, 244 F.3d at 1276 ("We decline to decide the

18

question of which law governs this determination, because in either event, we conclude that this legal malpractice claim is property of Alvarez's bankruptcy estate."). It examines Florida law and concludes that under it the claim would be property of the estate if state law governs the definition of property. It then explains why under the Segal test the claim would also be property of the estate if federal law governs the definition of property. Id. at 1278–79.

The real reason that the Alvarez panel did not have to decide whether state or federal law governed the definition of property for purposes of the bankruptcy estate is that question had already been decided. Prior panel decisions had held that the question of whether a debtor's interest in property is property of the estate is a federal question, but the definition of property, issues about the nature and existence of the debtor's interest, are issues of state law. See, e.g., Hall Motors, Inc. v. Lewis (In re Lewis), 137 F.3d 1280, 1283 (11th Cir. 1998); Southtrust Bank of Alabama v. Thomas (In re Thomas), 883 F.2d 991, 995 (11th Cir. 1989). The Alvarez panel was bound by those decisions, although its implication that the question was still open was harmless to that appeal since it did not affect the result. It has, however, confused our colleague. In any event, to the extent that anything in the Alvarez opinion supports the dissent's position it is contrary to the holdings in In re Lewis and In re Thomas, and under the prior panel precedent rule we are

19

obliged to follow those earlier decisions. See United States v. Hornaday, 392 F.3d 1306, 1316 (11th Cir. 2004); Cohen v. Office Depot, Inc., 204 F.3d 1069, 1072 (11th Cir. 2000). The Witko decision, which came after Alvarez, did the right thing in following the earlier panel decisions.

The Burgess dissenters' reliance on the Supreme Court's decision in Whiting Pools is also misplaced, but for a different reason. In that case the Court addressed the question of whether certain personal property seized by the IRS the day before the debtor filed for bankruptcy was subject to being turned over to the debtor under § 542(a) of the Bankruptcy Code. United States v. Whiting Pools, 462 U.S. 198, 199–200, 103 S. Ct. 2309, 2310–11 (1983). The case was about § 542(a), but § 541(a)(1) was implicated because § 542(a) authorizes turnover of property in another's possession only if it is property of the estate. See id. at 205–07, 103 S. Ct. at 2313–15. For that reason, the Court had to determine whether the seized property the debtor wanted the IRS to return was property of the estate. The Court stated that "[a]lthough [section 541(a)(1) and section 542(a)] could be read to limit the estate to those interests of the debtor in property at the time of the filing of the petition, we view them as a definition of what is included in the estate, rather than as a limitation." Id. at 203, 103 S. Ct. at 2312. It is this

20

statement that the Burgess dissenters seized upon. See Burgess, 438 F.3d at 510 (Jones, C.J., dissenting).

We do not read that decision as they do. We do not interpret the statement quoted from the Whiting Pools opinion to hold that § 541(a)(1) does not mean what it says; we do not interpret it to mean that provision does not impose a temporal limitation on the definition of property of the estate. Instead, we interpret the statement in the context in which it was made. The Court was dealing with property for which the debtor had legal title but not possession at the key time, which was the date the reorganization petition was filed in that Chapter 11 case.

The Court concluded in Whiting Pools, that "§ 542(a) grants to the estate a possessory interest in certain  property of the debtor that was not held by the debtor at the commencement of reorganization proceedings." 462 U.S. at 207, 103 S. Ct. at 2314–15 (emphasis added). The Court applied the § 541(a)(1) temporal limitation to whether the debtor had legal title of the property at the time the estate was created, as we do here. It also held that § 541(a)(1) did not require the debtor to have possession of the property, in addition to a legal or equitable interest in it, to the extent that § 542(a) permits the trustee to take possession.

In other words, in Whiting Pools the Court determined that § 541(a)(1) was "intended to include in the estate any property made available to the estate by other

21

provisions of the Bankruptcy Code," and that § 541(a)(1) would not limit other Code provisions which bring into the estate property that the debtor did not have a possessory interest in at the time of filing.  Id. at 205, 103 S. Ct. at 2314–15. Thus, in Whiting Pools, the debtor did have interests in the disputed property "as of the commencement of the case."  The Whiting Pools opinion explains how § 542(a) works together with § 541(a)(1).  It does not purport to decide how § 541(a)(1) operates in a case, like this one, in which § 542(a) is not implicated.

Our dissenting colleague argues that decisions of the Supreme Court and this Court establish that a crop loss automatically creates property rights.  The Supreme Court cases that the dissent relies on are two cases from the 1800's, Williams v. Heard, 140 U.S. 529, 11 S. Ct. 885 (1891), and Milnor v. Metz, 41 U.S. 221 (1842).  Of course, both of those decisions pre-date the adoption of the Bankruptcy Code, and the critical language we are interpreting, by a century or so. Not only that, but both cases are distinguishable because the debtors had claims which pre-existed their bankruptcy filings.  In Williams the Court noted that "the act of congress did not create the rights.  They had existed at all times since the losses occurred."  Williams, 140 U.S. at 541, 11 S. Ct. at 888.  Similarly, in Milnor the Court noted that if "a similar claim on the part of Milnor [had] existed against an individual, instead of the government, then there can be no doubt, he could have

22

recovered by suit . . . . As the government was equally bound to do its debtor justice, in a different mode, with an individual, we think no sound distinction exists in the two cases." Milnor, 41 U.S. at 227. Those two statements indicate why those cases were different from this case. The debtors had pre-existing claims which were property of the estate. In this case there was only the crop loss itself with no claim of entitlement arising from it until Congress created one. The crop loss was the result of an act of nature and by itself did not give rise to a claim against anyone. Bracewell had no right to be compensated until Congress enacted the legislation giving him a right and that did not occur until after he had filed for bankruptcy, or in the critically important words of § 541(a)(1), not until after "as of the commencement of the case."

Like the Supreme Court decisions our dissenting colleague relies upon, our decisions in Witko and Alvarez do not support the proposition that a loss creates a contingent interest which may be property of the bankruptcy estate. The dissenting opinion makes the same error with respect to both cases, asserting that in each we decided whether the debtor's malpractice suit was property of the estate by determining whether the debtor had suffered harm pre-petition. All that Witko and Alvarez recognize in this respect is that suffering harm is a necessary, although not sufficient, element of a legal malpractice claim under the relevant state law in both

cases. In both cases the Court determined whether all the elements of a malpractice cause of action, including the suffering of harm, existed at the time the debtors filed their bankruptcy petition. Neither decision held or implied that harm alone would be legally sufficient. Instead, what we did in Witko and Alvarez is what we have done here, which is determine whether on the date the bankruptcy case commenced the debtor had an enforceable property right—there a malpractice claim, here a claim for crop loss payments under a congressional act.

**III**.

The next question we address is whether anything in § 541(a)(6) expands the definition of property enough to encompass the disaster relief payment Bracewell received. That provision extends the definition of property of the estate to include "[p]roceeds, product, offspring, rents, or profits of or from property of the estate . . . ." 11 U.S.C. § 541(a)(6). The key language for present purposes is that the proceeds must be "of or from property of the estate." See id. If the property of the estate does not include a potential future payment that the debtor is not legally entitled to receive at the time of filing, nothing in § 541(a)(6) pushes the later-acquired legal or equitable interest back into the estate. As we have discussed at some length already, Bracewell did not have a cognizable interest in his hoped for relief payment until the Agriculture Assistance Act of 2003 came into being, and

24

that occurred after he had already filed his petition. Thus, the property of his estate did not include an interest that could generate proceeds.

We are not persuaded by the trustee's contention that the payments are proceeds because they relate back to a pre-petition crop. He argues that the payment is a substitute or compensation for the portion of the debtor's crops that did not grow because of the disaster. We agree that any compensation the debtor receives directly from disposition of the pre-petition crops, after the filing date, is proceeds of property of the estate. However, in the Agricultural Assistance Act of 2003 Congress did not purport to purchase the ruined crops of farmers like Bracewell. Instead, Congress provided assistance to farmers like him because of losses they had suffered in the past. See Agricultural Assistance Act of 2003, § 202(a) ("The Secretary . . . shall use such sums as are necessary . . . to make emergency financial assistance available to producers on a farm that have incurred qualifying losses for the 2001 or 2002 crop of an agricultural commodity due to damaging weather or related condition . . ."). Because this assistance was not given in exchange for property of the estate, it is not proceeds of property of the estate.

The en banc Fifth Circuit reached this same conclusion in the Burgess case. See Burgess, 438 F.3d at 503. It held that Burgess, whose situation is identical to

25

Bracewell's, had no interest in property at the commencement of the bankruptcy case that could mature into the crop disaster payment. Id. at 504. As the court explained, "[i]f Burgess had no right or interest that constituted property within the meaning of § 541(a)(1) at the commencement of the case, then the payment he later received cannot be proceeds of property of the estate under § 541(a)(6)." Id. at 499.

The dissenters in Burgess and our dissenting colleague assert that under the applicable state law the disaster payments would be characterized as proceeds of the lost crops. Id. at 517; dissenting opinion at 56-60. The argument is that under Georgia law collateral includes "inchoate rights, in any and all crops to be planted, grown or produced on [the] property in the future," dissenting opinion at 56-57 (quoting Sw. Ga. Prod. Credit Ass'n v. James, 350 S.E.2d 786, 788 (Ga. Ct. App. 1986), and proceeds are "claims arising out of the loss[] . . . or damage to the collateral." Id. (quoting O.C.G.A. § 11-9-102(a)(63). While we do look to state law to define what is property, the dissenting position overlooks the fact that "whether a debtor's interest constitutes property of the estate is a federal question." Lewis, 137 F.3d at 1283 (quotation marks omitted). Therefore, a property interest, however it is characterized by state law, can only be property of the estate if it is within the definition contained in the federal Bankruptcy Code. Under § 541(a)(6)

26

that interest must be "[p]roceeds . . . of or from property of the estate" in order to be property of the bankruptcy estate. 11 U.S.C. § 541(a)(6). And to be property of the estate for proceeds generating purposes, it must have been property of the estate at the time the bankruptcy petition was filed.

The dissenters also worry about problems that would result for debtors and creditors if the payments are defined as proceeds by state law but not included in the bankruptcy estate. If there is any cause for concern about that, the fact remains that we are not commissioned to cure problems in the operation of statutory schemes Congress has designed. The Supreme Court has pointedly stated that "[c]ourts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement," Badaracco v. Comm'r of Internal Revenue, 464 U.S. 386, 398, 104 S. Ct. 756, 764 (1984), and we have recognized that "[o]ur function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them." Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002). If there are problems with the way a statute operates, Congress can alter the statute to eliminate those problems; we cannot. Only judicial activists use interpretation as a tool for improving statutes to their liking, and none of us are judicial activists.

27

To be sure, there is some support in the decisions of bankruptcy courts for the position that crop disaster payments to which a debtor becomes entitled after filing or conversion are proceeds under § 541(a)(6). See FarmPro Servs., Inc. v. Brown (In re FarmPro Servs., Inc.), 276 B.R. 620 (D. N.D. 2002); Lemos v. Rakozy (In re Lemos), 243 B.R. 96 (Bankr. D. Idaho 1999); White v. United States (In re White), No. BRLBB-00971C, 1989 WL 146417 (Bankr. N.D. Iowa Oct. 27, 1989). We are aware of those decisions but do not find them to be persuasive. None of them raises an argument that we have not already addressed. They all fail to give full allegiance to the congressional will manifested in the plain language of the Bankruptcy Code.

The trustee attempts to analogize disaster assistance to insurance payments. Insurance payments are explicitly included in the UCC definition of "proceeds," U.C.C. § 9-306(1), and there is authority for the proposition that the bankruptcy Code's definition of "proceeds" is at least as broad as the UCC definition. See, e.g., Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.), 907 F.2d 1430, 1437 (4th Cir. 1990). There is a difference between insurance payments stemming from the destruction of property in the estate and disaster assistance authorized after the estate was created as a result of property that was destroyed before the estate came into being.

The analogy to insurance would be closer if an assistance payment were for losses suffered to crops that were in the estate at the time the petition was filed. That, however, is not what happened here. The relief payment did not stem from any loss to property of the estate, because the crops were already lost before the estate came into being. Still, if the debtor had at the time of filing a legal or equitable right to a payment for crop losses, the situation would be like one in which the debtor had a right to insurance proceeds at the time of filing. See First State Bank of Abernathy v. Holder (In re Nivens), 22 B.R. 287, 291 (Bankr. N.D.Tex. 1982). But, as we held earlier, there is no legal or equitable right to crop assistance payments until the authorizing legislation is enacted.

For these reasons we agree with the Fifth Circuit's holding in Burgess that if Bracewell "had no right or interest that constituted property within the meaning of § 541(a)(1) at the commencement of the case, then the payment he later received cannot be proceeds of property of the estate under § 541(a)(6)." Burgess, 438 F.3d at 499. If the law creating the right to a disaster payment exists before the debtor files for bankruptcy and the debtor subsequently applies for and receives the payment, it could be proceeds of property of the estate. But if the disaster assistance legislation is not law at the time of filing, the debtor at that time has no

29

legal or equitable interest in the payment and so there is no property of the estate to generate proceeds.

## IV.

Because the crop disaster payment made to Bracewell was not property of the bankruptcy estate under § 541(a)(1) or § 541(a)(6), the district court's order is AFFIRMED.

PRYOR, Circuit Judge, dissenting:

"'If' is a big word," Bracewell v. Kelley, No. 05-11951, slip op. at 9 (11th Cir. June 30, 2006), but it is not the determinative word in this appeal for two reasons. First, Bracewell's crop disaster payment is part of the debtor estate because "property of the estate" includes the contingent interest in disaster relief created by a reduced yield. See 11 U.S.C. § 541(a)(1). Second, Bracewell's crop disaster payment is "proceeds . . . from property of the estate" under the settled state law of property rights. 11 U.S.C. § 541(a)(6). I respectfully dissent.

## I. BACKGROUND

I first explain the history of the Agricultural Assistance Act of 2003 and its interaction with Bracewell's conversion under Chapter 7. The majority opinion appropriately and accurately explains what we know from the record: A drought caused Bracewell to suffer lower-than-expected yields. On May 29, 2002, because Bracewell was unable to pay for his farm-related debt, Bracewell filed a petition under Chapter 12 of the Bankruptcy Code. In a Chapter 12 proceeding, Bracewell's crop disaster payment would have been included in the bankruptcy estate. Although not part of the record or evidence, other events illustrate the potential for abuse that the decision of the majority allows.

31

In the real world, in June 2002, a month after Bracewell filed his bankruptcy petition, several members of Congress announced to the press that they had begun work to provide drought assistance to farmers. See, e.g., Press Release, Congressman Tom Osborne, Osborne Refuses to Send Congress Home Without Securing Drought Assistance (Oct. 16, 2002), available at http://www.house.gov /apps/list/press/ne03_osborne/pr20021016crno.html. In July, Congressman John Thune sponsored the Emergency Farmer and Rancher Assistance Act of 2002 to grant relief for crop losses in 2001 and 2002. H.R. 5310, 107th Cong. (2002). Congress recessed at the end of that year before the legislation was enacted. Id.

On Friday, January 3, 2003, Bracewell converted his case under Chapter 7. Four days later, on Tuesday, January 7, 2003, Congress reconvened, and the drought assistance legislation was reintroduced in the House as part of an appropriations bill. 108 Bill Tracking H.J. Res. 2. On February 20, 2003, Congress enacted the Agricultural Assistance Act of 2003, which provided financial assistance to farmers who suffered crop losses in 2001 and 2002. Id. As the record shows, Bracewell then argued successfully that the money he later received from the government should not be included in the bankruptcy estate because he converted his case under Chapter 7 before Congress enacted the Agricultural Assistance Act of 2003.

32

I have no idea whether Bracewell knew about the proceedings in Congress that led to the enactment of the Agricultural Assistance Act of 2003. There is no evidence that he did, but we should not be oblivious to the possibility that some farmers already pay attention to these sorts of matters, and the majority opinion will cause farmers in bankruptcy to monitor them more closely. The workings of Congress are reported by the press, and farmers who suffer natural disasters already have incentives to investigate the likelihood of forthcoming relief. The majority opinion now gives them even more incentives. As we consider whether losses that ripen into post-petition gain are included in the debtor estate, the background of these real-world consequences should not be forgotten. See Fed R. Evid. 201 advisory committee's note ("The judicial process cannot construct every case from scratch, like Descartes creating a world based on the postulate Cogito ergo sum." (quoting Kenneth Davis, A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law 69, 73 (1964)).

In the context of this chronology, it becomes clear why the decision of the majority runs contrary to the policy goals of the Bankruptcy Code. Three fundamental policies of the Bankruptcy Code are (1) to discourage a race of creditors to the courthouse, Union Bank v. Wolas, 502 U.S. 151, 161, 112 S. Ct. 527, 533 (1991), (2) to preserve the security interests of creditors, United States v.

33

<u>Whiting Pools, Inc.</u>, 462 U.S. 198, 204, 103 S. Ct. 2309, 2313 (1983), and (3) "to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy." <u>Butner</u>, 440 U.S. at 55, 99 S. Ct. at 918 (internal quotations and citation omitted). Instead of discouraging a creditors' race to the courthouse, the decision of the majority encourages debtors who are farmers to race to the courthouse to file or convert cases under Chapter 7 before Congress enacts farm assistance bills. Instead of preserving creditors' security interests, the decision of the majority impairs security interests in crops damaged by natural disasters. Instead of a fresh start for debtors, the decision of the majority grants debtors who are farmers a windfall. A thorough inspection of the statutory language, precedents of the Supreme Court and our Court, and the legislative history of the Bankruptcy Code compels me to conclude that Congress did not intend to overturn the settled policy goals of bankruptcy in this circumstance.

## II. DISCUSSION

My discussion is divided in two parts. I first look to the Bankruptcy Code, Supreme Court precedent, and legislative history to address the erroneous assumption of the majority that a loss incurred before the commencement of bankruptcy does not create a contingent interest that is "property of the estate." 11 U.S.C. § 541(a)(1). I next review the state law of property rights to conclude that

34

Bracewell's crop disaster payment is "proceeds of the estate." 11 U.S.C. § 541(a)(6). Under either view, the decision of the district court to exclude Bracewell's crop disaster payments from the debtor estate was wrong.

*A. A Contingent Interest Created by a Loss Is "Property" of the Debtor Estate.*

Section 541(a)(1) of the Bankruptcy Code provides that property of the debtor estate "is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). All property interests of the debtor vest in the bankruptcy estate when the debtor files for bankruptcy. See 11 U.S.C. § 301; In re Alvarez, 224 F.3d 1273, 1277 (11th Cir. 2000). "Property" has a broad meaning that encompasses "everything of value the bankrupt may possess in alienable or leviable form when he files his petition." Segal v. Rochelle, 382 U.S. 375, 379, 86 S. Ct. 511, 515 (1966). Section 541 is "a definition of what is included in the estate, rather than . . . a limitation" on the estate. Whiting Pools, 462 U.S. at 203, 103 S. Ct. at 2312.

Although the majority finds the statutory language of section 541(a)(1) "clear" and "so plain," Bracewell, slip op. at 4-5, I do not. I am unable to find any mention in section 541(a)(1) about whether an interest created by a pre-petition crop loss constitutes "property as of the commencement of the case." 11 U.S.C. § 541(a)(1). If anything, the definition of "property" as "all legal or equitable

35

interests . . . as of the commencement of the case," id. (emphasis added), suggests that Bracewell's crop loss is a contingent interest in property included in the bankruptcy estate, but the text of section 541 does not resolve that issue definitively.

The majority's alleged reliance on statutory text rests not on the plain language, but on two unsound assumptions.  First, the majority assumes that a contingent interest in the form of a reduced yield is not a "legal or equitable interest" in property.  Second, the majority assumes that whether a property interest exists "as of the commencement of the case" depends on the date of the enabling legislation for the crop disaster payment, instead of the date of the crop loss.  The statutory language, legislative history, and controlling precedents from the Supreme Court establish that both assumptions are erroneous.

Two principles govern whether a loss incurred pre-petition is an interest included in the debtor estate.  First, contrary to the majority's first assumption, a loss may give rise to a property interest before enabling legislation grants payment for the loss.  Williams v. Heard, 140 U.S. 529, 541, 11 S. Ct. 885, 888 (1891).  Second, contrary to the majority's second assumption, whether an interest accrued "as of the commencement of the case," 11 U.S.C. § 541(a), is determined by reference to the date the loss is incurred, not the date the payment is received, see

Williams, 140 U.S. at 541, 11 S. Ct. at 888. A post-petition gain is "sufficiently rooted in the pre-bankruptcy past" if a corresponding loss was incurred pre-petition. See Segal, 382 U.S. at 380, 86 S. Ct. at 515.

The Supreme Court has held that the debtor estate includes contingent interests that ripen into legal rights after commencement of the bankruptcy proceeding. In Segal, the Court held that a potential loss-carryback tax refund constituted "property" under the Bankruptcy Code. 382 U.S. at 381, 86 S. Ct. at 516. The Court stated that "property" under section 541 is "construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." Id. at 379, 86 S. Ct. at 515. Although the debtor in Segal could not establish a right to a tax refund until the end of the tax year, "postponed enjoyment does not disqualify an interest as 'property'" and "contingency in the abstract is no bar." Id. at 380, 86 S. Ct. at 515. The Court explained that "taxes had been paid on net income within the past three years, and the year of bankruptcy at that point exhibited a net operating loss." Id. Because the prospective refund was "sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start," the tax refund, once received, was included in the debtor estate. Id.

To avoid the binding authority of Segal, the majority argues that Segal was superseded by the enactment of the Bankruptcy Code. The majority states that it "will not attribute to the Supreme Court an intent to construe legislative language that it had not seen and which would not even exist for another dozen years." Bracewell, slip op. at 17. As support, the majority cites to Drewes v. Vote (In re Vote), 261 B.R. 439, 443–44 (B.A.P. 8th Cir. 2001), and Burgess v. Sikes (In re Burgess), 438 F.3d 493, 498 (5th Cir. 2006) (en banc), where the Bankruptcy Appellate Panel for the Eighth Circuit and the Fifth Circuit respectively distinguished Segal to conclude that crop disaster payments are not part of the debtor estate.

The court in Vote limited the test in Segal to tax refunds because of the legislative history of the Bankruptcy Code. The court explained that Congress may have intended to limit the holding of Segal to tax refunds when it enacted the new Bankruptcy Code. Vote, 261 B.R. at 443–44. Because the court found the precedential value of Segal to be questionable and the crop disaster legislation was enacted post-petition, the court concluded that such payments are not part of the debtor estate. Id.

The Fifth Circuit also distinguished Segal because "although Congress has specifically approved of Segal's result, Segal's 'sufficiently rooted' test did not

38

survive the enactment of the Bankruptcy Code." Burgess, 438 F.3d at 498. The

court in Burgess explained that the statutory language considered in Segal is

different from the language of section 541. "Thus, under current law, a debtor's

interest in property may be contingent . . . until after bankruptcy, but the debtor

must have had a prepetition legal interest nonetheless." Id. at 499. The Fifth

Circuit concluded that the debtor had no legal interest in the crop disaster payment

"because the legislation authorizing the payment had not yet been enacted." Id.

The statutory text, our precedent, and legislative history establish that

"[t]here is little or no support" for the view of the majority and the Fifth Circuit

that the current Bankruptcy Code superseded the holding in Segal. Id. at 512

(Jones, C.J., dissenting). First, section 541 did not supersede Segal because

Congress did not materially alter the text of the statute. The previous version of

the Code provided, "The trustee of the estate of a bankrupt . . . shall . . . be vested

by operation of law with the title of the bankrupt as of the date of the filing of the

petition . . . to all of the following kinds of property wherever located." 11 U.S.C.

§ 110(a) (1964) (emphases added). The current version of the Code provides that

property of the estate "is comprised of all the following property, wherever located

and by whomever held: . . . all legal or equitable interests of the debtor . . . as of

the commencement of the case." 11 U.S.C. § 541(a)(1) (emphases added).

39

"[A]bsent express indications to the contrary, the reenactment of statutes in substantially the same form or their wholesale adoption into other statutory schemes is presumed to perpetuate and incorporate the judicial baggage that has accumulated in relation to those provisions." Rivers v. Rosenthal & Co., 634 F.2d 774 (5th Cir. 1980), vacated on other grounds, 456 U.S. 968, 102 S. Ct. 2228 (1982). The majority does not respond to this argument. The change in statutory language is legally insignificant because the broad definition of "property" and the temporal limitation considered in Segal continues in the current version of section 541(a)(1).

Second, our Court has applied Segal twice to guide our interpretation of the current Bankruptcy Code. See, e.g., Witko v. Menotte (In re Witko), 374 F.3d 1043 (11th Cir. 2004), Alvarez, 224 F.3d at 1278. We stated, in Alvarez, that although "Segal was decided under the 1898 Act, nothing in the changed language suggests a change in the relevant Segal holding." 224 F.3d at 1278 n.13. In Witko, the decision upon which the majority principally relies, we discussed Segal at length and relied on Segal for the proposition that a trustee may "seek the interests existing, though still undetermined in quantity, at the time the debtor filed his petition." Witko, 374 F.3d at 1043. Other circuits likewise have applied the rationale in Segal. See, e.g., In re Yonikus, 996 F.2d 866, 869 & n.3 (7th Cir.

1993); In re Schneider, 864 F.2d 683, 685 (10th Cir. 1988); In re Ryerson, 739 F.2d 1423, 1426 (9th Cir. 1984). These decisions explain that the precedential value of Segal was not diminished by the enactment of the current Bankruptcy Code.

Third, the majority ignores the legislative history of the current code, which states that Congress endorsed the conclusion in Segal. "The result of Segal v. Rochelle, 382 U.S. 375, 15 L. Ed. 2d 428, 86 S. Ct. 511 (1966), is followed . . . ." See S. Rep. No. 989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R. Rep. No. 595, 95th Cong., 1st Sess. 367, reprinted in 1978 U.S.C.C.A.N. 5963, 6323; see Alvarez, 224 F.3d at 1279 n.13 (stating that "the legislative history expressly indicates that the current Code follows Segal's result"). Despite a professed concern about erroneously ascribing an intent to the Supreme Court, the majority readily ascribes a dubious intent to Congress based on, at best, ambiguous language without resorting to legislative history. Cf. CBS v. Primetime 24 J.V., 245 F.3d 1217, 1224 (11th Cir. 2001). A consistent reading of both the earlier and later statutory language, the guidance derived from decisions of our Circuit and sister circuits, and the legislative history leads me to conclude that the current Bankruptcy Code did not supersede the holding in Segal.

41

Two venerable decisions of the Supreme Court buttress the holding in Segal. See Williams v. Heard, 140 U.S. 529, 11 S. Ct. 885 (1891); Milnor v. Metz, 41 U.S. (16 Pet.) 221 (1842). These precedents establish that property rights are "created by reason of losses having been suffered," Williams, 140 U.S. at 541, 11 S. Ct. at 888, not by later legislation that provides compensation for those losses. Each of these decisions supports the Trustee's argument that Bracewell's crop loss was a contingent property interest when he filed for bankruptcy.

The later decision, Williams, involved a payment created by Congress for a loss suffered during the Civil War. Id. at 539, 11 S. Ct. at 887. The debtor in Williams had insured ships damaged in the Civil War. Id. at 539–40, 11 S. Ct. at 887. He filed for bankruptcy in 1875 and obtained a discharge in 1877. Id. at 539, 11 S. Ct. at 887. In 1882, five years after the discharge from bankruptcy, Congress passed legislation to distribute money awarded to the United States from a treaty executed with Great Britain. Id. The debtor was awarded compensation based on this legislation. Id. The Supreme Court included the distribution from the treaty in the bankruptcy estate because "[t]here [was] . . . at all times a possibility that the government would see that [those who suffered harm] were paid." Id. at 541, 11 S. Ct. at 888 (emphasis added). The Court explained that "there was at all times a moral obligation on the part of the government to do justice to those who had

42

suffered in property. . . . [T]he act of Congress did not create the rights. They had existed at all times since the losses occurred." Id.

The earlier decision, Milnor, reached the same result for a debtor who received a payment based on post-petition legislation. 41 U.S. at 227. In Milnor, the debtor was a gauger in the port of Philadelphia. 41 U.S. at 225. In 1836, an act of Congress reduced duties upon wine that required the debtor to perform extraordinary services "at the instance of the government" without compensation. Id. at 226. In 1839, the debtor filed for bankruptcy, and in 1840, Congress enacted legislation that compensated the debtor for his services. Id. at 224. Although Congress enacted legislation that granted compensation post-petition and "no claim existed against the United States, which could be judicially recognised as 'property'" before the debtor filed for bankruptcy, the Court included the compensation in the debtor estate. Id. at 227.

The majority opinion and the Fifth Circuit distinguished Milnor and Williams on the grounds that both cases "predate the enactment of the current Bankruptcy Code by approximately 100 years" and "stand for the proposition that a prepetition loss is property of the estate if it gives rise to a prepetition legal claim or interest." Burgess, 438 F.3d at 503; see Bracewell, slip op. at 22-23. The Burgess court explained that the debtor in Milnor had a pre-petition legal interest

43

because "even though [debtor] Milnor could not sue the government for the amount of the debt, the debt still existed." Burgess, 438 F.3d at 504. The court also distinguished Williams because "the debtors had a legal claim against someone," while the bankrupt farmer in Burgess "had no claim against anyone." Id. at 505. I find both reasons unpersuasive.

That Williams and Milnor were decided before the enactment of the Bankruptcy Code does not blunt their proposition that "even a prepetition loss of the debtor's property may itself constitute property when subsequent events afford a recovery for the loss." Id. at 512 (Jones, C.J., dissenting). It is fair to conclude that Congress was aware of the law of property rights as recognized in bankruptcy when it enacted the current version of the Bankruptcy Code because "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law." Cannon v. Univ. of Chi., 441 U.S. 677, 696–97, 99 S. Ct. 1957–58 (1979). Although the Courts in Williams and Milnor did not consider the current version of section 541(a), they nonetheless confronted what is a "legal or equitable interest" included in the debtor estate. Compare Williams, 140 U.S. at 538, 11 S. Ct. at 887 ("[N]o individual claimant had, as a matter of strict legal or equitable right, any lien upon the fund awarded, nor was Congress under any legal or equitable obligation to pay any claim out of the proceeds of that fund." (emphases added)),

44

and Milnor, 41 U.S. at 226 (analogizing the debtor's right to cases where debtors had no "equitable or legal set-off"), with 11 U.S.C. § 541(a) ("Such estate is comprised of . . . all legal or equitable interests . . . ." (emphasis added)). Both decisions are applicable to Bracewell's crop disaster payment because they address the limits of a contingent property interest in the bankruptcy context.

The factual distinctions between Williams and Milnor, on the one hand, and Bracewell's crop disaster payment, on the other hand, are immaterial. Although in Milnor "[t]he services performed by Milnor were at the instance of the government" and "the government was equally bound to do its debtor justice," Milnor, 41 U.S. at 227, Milnor had no enforceable right against the government when he filed for bankruptcy. Although the Fifth Circuit found significant in Williams that "the debtors had a legal claim against someone," Burgess, 438 F.3d at 505, the fact remains that the debtor had no enforceable rights against the government. See Williams, 140 U.S. at 538, 11 S. Ct. at 887 ("[N]o individual claimant had, as a matter of strict legal or equitable right, any lien upon the fund awarded."). Although the possibility was remote that Britain would compensate American casualties of war and Congress would enact legislation that granted relief five years after the debtors were discharged from bankruptcy, the Supreme Court concluded this eventuality was sufficient to create a contingent interest to be

45

included in the debtor estate. See id. ("Congress [was] under [no] legal or equitable obligation to pay any claim out of the proceeds of that fund."). The contingent interests held by the debtors in Williams and Milnor were premised on their pre-petition losses and the possibility, however remote, of compensation.

As in Williams, "[t]here was at least a possibility" that Congress would enact legislation to grant Bracewell relief, id., because "[g]overnment payments to farmers have long represented a major source of income for American farmers and ranchers," John K. Pearson, Lien on Me: Revised Article 9 and Government Entitlement Program Payments, 22-8 Am. Bankr. Ins. J. 24, 24 (2003). Bracewell's crop loss established "a possibility coupled with an interest" sufficient to be included in the debtor estate. Williams, 140 U.S. at 538, 11 S. Ct. at 887. The crop loss that Bracewell suffered pre-petition established a contingent property interest that ripened into a gain post-petition due to legislation enacted by Congress. "But the act of Congress did not create the rights. They had existed at all times since the losses occurred." Id. at 541, 11 S. Ct. at 888.

Under both Williams and Milnor, the inclusion of Bracewell's crop disaster payment in the debtor estate neither renders the phrase "as of the commencement of the case" meaningless nor runs "contrary to the plain meaning of the clear statutory language." Bracewell, slip op. at 12. The concern of the majority that

46

"any postpetition legislation or contract could retroactively create property of the estate," id., slip op. at 7 (citing Burgess, 438 F.3d at 503), is misplaced, because contingent interests, including losses, incurred after the commencement of the proceedings are not included in the debtor estate. Only contingent property interests that exist "as of the commencement of the case" can benefit the estate when those interests later ripen into post-petition gain.

Until today, our decisions have not deviated from these principles. We have stated, for example, that a legal malpractice complaint filed post-petition is "sufficiently rooted in the pre-bankruptcy past" to be included in the debtor estate. Alvarez, 224 F.3d at 1275. In Alvarez, we concluded that a debtor's malpractice suit accrued pre-petition under Florida law because the debtor, Alvarez, suffered harm pre-petition. Id. at 1277–78. Although Alvarez filed the malpractice complaint after the bankruptcy petition, Alvarez had suffered "sufficient injury to indicate that Alvarez had a cognizable interest" pre-petition. Id. at 1277. Because Alvarez "established an attorney-client relationship . . . prior to his filing for bankruptcy, and this cause of action arises directly out of Alvarez's interactions with the firm prior to filing," we applied the rationale of Segal to conclude that the malpractice complaint was included in the bankruptcy estate. Id. at 1278–79.

The majority's reliance on Witko, rather than Alvarez, is misplaced. In contrast with Alvarez, in Witko we excluded a complaint filed post-petition from the debtor estate because the debtor suffered harm post-petition. See Witko, 374 F.3d at 1043. Witko filed for bankruptcy in 1999. Id. at 1042. In 2000, Witko was denied alimony in a marital dissolution and he filed a malpractice suit against his divorce counsel. Id. We stated that "interests existing, though still undetermined in quantity, at the time the debtor filed his petition" are included in the debtor estate. Id. at 1043. We looked to Florida law and concluded that Witko's malpractice suit had not accrued before he filed his petition for bankruptcy because "[w]hen Witko filed his bankruptcy petition he had not yet suffered any harm." Id. at 1043–44. Witko is inapposite to this appeal because, unlike Bracewell, the debtor in Witko did not suffer a loss until after the commencement of the bankruptcy case.

Consistent with our precedent in Alvarez, the crop disaster payment Bracewell received is "property as of the commencement of the case." Bracewell planted his crops pre-petition, Bracewell lost his crops pre-petition, and the Act compensated Bracewell for the crop loss that occurred pre-petition. Bracewell's crop loss "point[ed] toward realization of a refund . . . at the time the[] bankruptcy petition[] [was] filed," Segal, 382 U.S. at 380, 86 S. Ct. at 515, because "Congress

48

frequently and regularly enacts a variety of farm subsidy programs," Lemos v. Rakozy (In re Lemos), 243 B.R. 96, 99 (Bankr. D. Idaho 1999). The crop disaster payment is "sufficiently rooted in the pre-bankruptcy past." Segal, 382 U.S. at 380, 86 S. Ct. at 515.

The majority finds solace in decisions of our sister circuits that have excluded crop disaster payments from the debtor estate when those payments were received post-petition. See Burgess, 438 F.3d at 497; Vote, 261 B.R. at 442. These courts and the majority have focused on the date that the legislation is enacted, instead of the date of the loss, to exclude crop disaster payments from the debtor estate. See Bracewell, slip op. at 7-8; Burgess, 438 F.3d at 499 ("[H]e did not have a prepetition claim to, or interest in, the disaster-relief payment because the legislation authorizing the payment had not yet been enacted."); Vote, 276 F.3d at 1026 ("Before Congress passed the Appropriations Act, [the debtor] had no interest of any kind."). As the Eighth Circuit reasoned, because "there was no assurance that Congress would authorize such payments or that the Debtor would qualify for them if they were authorized," the crop disaster payments are not included in the debtor estate. Vote, 276 F.3d at 444 (emphasis added).

In the light of Supreme Court precedent, I find the reasoning of both the majority and our sister circuits, in Burgess and Vote, unpersuasive. That Congress

49

enacted the legislation post-petition is not outcome determinative because a loss, by itself, may create a property interest without congressional legislation. Williams, 140 U.S. at 541, 11 S. Ct. at 888. When the loss accrues "as of the commencement of the case," it is included in the debtor estate.

The reliance of the majority on another decision of a sister circuit, In re Schmitz, 270 F.3d 1254 (9th Cir. 2001), is misplaced. The Ninth Circuit in Schmitz held that fishing rights assessed post-petition based on the debtor's fishing history "were not property of the bankruptcy estate because the regulations creating them were not adopted until after the bankruptcy petition was filed." Id. at 1256. Schmitz is inapposite to this appeal because, unlike Bracewell, the debtor in Schmitz did not suffer a loss before he filed for bankruptcy that was compensated by post-petition legislation.

Although, as the majority states, "'If' is a big word," Bracewell, slip. op at 9, it is not the determinative word because "property" includes contingent interests. Segal, 382 U.S. at 379, 86 S. Ct. at 515. The contingent nature of Bracewell's interest is similar to a loss carryback that may result in a tax refund if the taxpayer has the proper tax characteristics at the end of the year, Segal, 382 U.S. at 381, 86 S. Ct. at 516; a casualty of war that may result in payment from the execution of a treaty and legislation after the discharge of bankruptcy, Williams, 140 U.S. at 541,

50

11 S. Ct. at 888; the provision of overtime services to the government that may lead to payment based on post-petition legislation, Milnor, 41 U.S. at 227; or pre-petition harm caused by legal malpractice that may result in damages pending judicial process, Alvarez, 224 F.3d at 1277–78. See also In re Dalton, 146 B.R. 460, 463 (Bankr. D. Az. 1992) (holding that a lottery ticket purchased pre-petition that won post-petition was included in the debtor estate). Bracewell, like the debtors in Segal, Williams, Milnor, and Alvarez, was not yet entitled to his later payment when he converted his case under Chapter 7, but the crop disaster payment he received post-petition related to his pre-bankruptcy past.

The crop loss that Bracewell suffered created a contingent right to receive crop disaster relief of an unascertained value. After the crop loss, the only questions that remained were whether Congress would grant relief and whether Bracewell would fall within the purview of any legislation that Congress enacted. See http://disaster.fsa.usda.gov/nap.htm (listing eligibility requirements for crop disaster relief). The crop disaster legislation fixed the value that Bracewell received for his lost crops, but the earlier absence of legislation did not make Bracewell's crop loss, or contingent interest, a nullity. Nothing in the language of section 541, Supreme Court precedent, or Eleventh Circuit precedent suggests that the debtor estate only includes property with an absolute value, and I find no

51

principled method to create a sliding scale of contingent property interests that includes some interests in the debtor estate while excluding others.

The inclusion of crop disaster payments in the debtor estate comports with the policy of the Bankruptcy Code to prevent debtor abuse. Whether crop disaster payments are included in the debtor estate should not depend on the date of the legislative act because a debtor could exclude crop disaster payments if he chose to file his bankruptcy petition before Congress enacts legislation to grant relief. Bankruptcy policy dictates whether an interest is included in the debtor estate, Segal, 382 U.S. at 379, 86 S. Ct. at 515, and a debtor should not be allowed selectively to exclude property from the debtor estate by choosing the most advantageous date to file for bankruptcy. "The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession." Whiting Pools, 462 U.S. at 207, 103 S. Ct. at 2314–15. Other provisions of the Bankruptcy Code protect creditors' interests and prevent debtor abuse by limiting the debtor's ability to select property that will be included in the debtor estate. See 11 U.S.C. § 544(b)(1) (strong arm provisions); id. § 547 (voidable preferences); id. § 727 (fraudulent transfers); cf. Yonikus, 996 F.2d at 871 ("Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are

unavailable to the bankruptcy estate."). The exclusion of disaster payments from the bankrupt estate creates a windfall for the debtor at the expense of creditors contrary to the design of the Code.

I conclude that Bracewell's crop loss disaster payment is "property of the estate." 11 U.S.C. § 541(a)(1). Because Bracewell planted the crops pre-petition, lost the crops pre-petition, and legislation compensated him for that pre-petition loss, Bracewell's crop disaster payment was "rooted in the prebankruptcy past." Segal, 382 U.S. at 380, 86 S. Ct. at 515. I turn next to the majority's erroneous conclusion that Bracewell's crop disaster payment was not "proceeds" of the debtor estate.

*B. Bracewell's Crop Disaster Payment Is "Proceeds" of the Debtor Estate.*

The majority's devotion to statutory text is nowhere to be found when the majority concludes that the crop disaster payment is not included in the debtor estate as "proceeds" despite the plain language of the Georgia version of the Uniform Commercial Code. The majority states that "[i]f the property of the estate does not include a potential future payment that the debtor is not legally entitled to receive at the time of filing, nothing in § 541(a)(6) pushes the later-acquired legal or equitable interest back into the estate." Bracewell, slip op. at 24. The majority concludes that "the property of his estate did not include an interest that could

53

generate proceeds." Id. at 25. The majority overlooks the fact that, under state law, an expected yield is a leviable property interest and a crop disaster payment is "proceeds" of the expected yield.

Section 541(a)(6) of the Bankruptcy Code provides that the debtor estate includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate . . . ." 11 U.S.C. § 541(a)(6). Congress has stated that "proceeds" under the Bankruptcy Code is broader than under the Uniform Commercial Code. S. Rep. No. 989, 95th Cong., 2d Sess., at 83 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 368 (1977); 1978 U.S.C.C.A.N. 5787. "[T]he scope of . . . Section 541(a)(6) is quite broad, [and] encompass[es] any conversion in the form of property of the estate, and anything of value generated by property of the estate." In re Hanley, 305 B.R. 84, 86–87 (Bankr. M.D. Fla. 2003) (citations omitted). Under section 541(a)(6), "proceeds" must come from the "property of the estate" to be included in the debtor estate.

Although "whether a debtor's interest constitutes property of the estate is a federal question," Hall Motors, Inc. v. Lewis (In re Lewis), 137 F.3d 1280, 1283 (11th Cir. 1998), the majority agrees that state law governs the creation of property interests. Bracewell, slip op. at 26; see Butner, 440 U.S. at 54, 99 S. Ct. at 917–18. "Uniform treatment of property interests by both state and federal courts within a

54

State serves . . . to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'" Butner, 440 U.S. at 55, 99 S. Ct. at 918 (quoting Lewis v. Mfrs. Nat'l Bank, 364 U.S. 603, 609, 81 S. Ct. 347, 350 (1961)). "Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." Witko, 374 F.3d at 1043.

It is particularly appropriate to look to state law to interpret what is "proceeds" because the legislative history of section 541(a)(6) explicitly references the Uniform Commercial Code. "Proceeds here is not used in a confining sense, as defined in the Uniform Commercial Code, but is intended to be a broad term to encompass all proceeds of property of the estate." S. Rep. No. 989, 95th Cong., 2d Sess., at 83 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 368 (1977); 1978 U.S.C.C.A.N. 5787. "The definition of proceeds under the UCC is much narrower than the definition of proceeds under the Bankruptcy Code." FarmPro Servs., Inc. v. Brown (In re FarmPro Servs., Inc.), 276 B.R. 620, 626 (Bankr. D. N.D. 2002). If the definition of "proceeds" in the Uniform Commercial Code is "confining," id., then "proceeds" as defined in Bankruptcy Code undoubtedly must be broader. Because the definition of "proceeds" in the Georgia UCC encompasses a crop disaster payment and the definition of "proceeds" in the Bankruptcy Code is

broader than the UCC, crop disaster payments are <u>a fortiori</u> included in the debtor estate as "proceeds."

Georgia law defines "proceeds" as "(A) Whatever is acquired upon . . . disposition of the collateral; (B) Whatever is collected on, or distributed on account of, collateral; (C) Rights arising out of collateral; (D) To the extent of the value of the collateral, claims arising out of the loss[] . . . or damage to the collateral." O.C.G.A. § 11-9-102(a)(63). "'Collateral' means the property subject to a security interest or agricultural lien." <u>Id.</u> § 11-9-102(a)(13). Georgia broadly interprets "collateral" under the UCC to include "inchoate rights, in any and all crops to be planted, grown or produced on [the] property in the future." <u>Sw. Ga. Prod. Credit Ass'n v. James</u>, 350 S.E.2d 786, 788 (Ga. Ct. App. 1986). Under Georgia law, a crop disaster payment is the result of a "loss[] . . . or damage to" crops "to be planted, grown, or produced." O.C.G.A. § 11-9-102(a)(63)(D); <u>Sw. Ga. Prod. Credit Ass'n</u>, 350 S.E.2d at 788.

Bracewell's crop disaster payment is "proceeds" under the Georgia Uniform Commercial Code. Bracewell received the payment for "the loss of . . . or damage to" his crops. O.C.G.A. § 11-9-102(a)(63)(D). Bracewell's payment is "from property of the estate," <u>see</u> 11 U.S.C. § 541(a)(6), because the expected crop yield was a leviable and cognizable property interest under Georgia law. <u>See Sw. Ga.</u>

56

Prod. Credit Ass'n, 350 S.E.2d at 787 (holding that a creditor's security interest in "all crops now growing or may hereafter be planted, grown or produced within seven years from the date hereof and all proceeds therefrom" granted the creditor a right to receive money from a reduced yield even though "no profit was made" (internal quotation marks omitted)).  Thanks in part to the creditors seeking relief in his bankruptcy, Bracewell planted crops and, despite a lower-than-expected yield, obtained a payment for his reduced yield.  The crop disaster payment "ar[ose] out of the loss of . . . or damage to" Bracewell's expected crops.  O.C.G.A. § 11-9-102(a)(63)(D).  If Bracewell had never planted or expected crops, he never would have received the crop disaster payment.

The majority reasons that Bracewell's payment is not proceeds "[b]ecause th[e crop disaster payment] was not given in exchange for property of the estate," Bracewell, slip op. at 25, but Georgia law—and consequently the Bankruptcy Code—does not limit "proceeds" to items "given in exchange for property of the estate," id.; Georgia law requires only that "proceeds" "aris[e] out of the loss of . . . or damage to" the crops, O.C.G.A. § 11-9-102(a)(63)(D).  Proceeds "is meant to include anything that is received in consequence of the disposition of collateral." In re Schmaling, 783 F.2d 680, 683 (7th Cir. 1986) (quoting In re Connelly, 41 B.R. 217, 220 (Bankr. D. Minn. 1984)).  The reliance by the majority on the

congressional intent of the Agricultural Assistance Act of 2003 to characterize the payment as "assistance" to farmers, Bracewell, slip op. at 25, is likewise unavailing because nothing in Georgia law or the Bankruptcy Code excludes a payment meant as assistance.

The majority expressly declines to discuss decisions that have enforced security interests in crop disaster payments. Several courts have recognized the right of a creditor to acquire a security interest in crop disaster payments and collect the payment through bankruptcy. See Schneider, 864 F.2d at 685; Pombo v. Ulrich (In re Munger), 495 F.2d 511, 513 (9th Cir. 1974); In re Boyett, 250 B.R. 817, 822 (Bankr. S.D. Ga. 2000); FarmPro Servs., Inc., 276 B.R. at 626; Lemos, 243 B.R. at 101; In re Kruse, 35 B.R. 958, 965 (Bankr. D. Kan. 1983); cf. Schmaling, 783 F.2d at 683 (concluding that the security agreement in that case did not cover proceeds, but stating that government entitlements are proceeds where crops were actually planted). Courts have also concluded that creditors have a right to proceeds from government programs when the debtor plants crops that never materialize, although the debtor did not participate in the government program when the creditor established the security interest. See Kruse, 35 B.R. at 965.

The conclusion of the majority leads to an absurd result. The exclusion of the payment as proceeds of the debtor estate violates the fundamental tenet of bankruptcy law to preserve the security interests of creditors within bankruptcy. "The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession." Whiting Pools, 462 U.S. at 207, 103 S. Ct. at 2314–15. "[T]he protections afforded secured creditors under the Code generally adhere first to the principle that the secured creditor is entitled to priority payment out of its collateral, and second to the principle that the secured creditor is entitled to receive the equivalent value of its collateral." Colliers on Bankruptcy ¶ 506.02 (15th ed. rev. 2006).

Under the majority's view, a debtor can effectively void a valid security interest held by a creditor by filing a bankruptcy petition. Outside of bankruptcy, under the definition of "proceeds" in Georgia law, a creditor with a security interest in the proceeds of a debtor's crop would be able to recover any crop disaster payment the debtor receives. See O.C.G.A. § 11-9-102(a)(63); cf. Sw. Ga. Prod. Credit Ass'n, 350 S.E.2d at 787. Within bankruptcy, the same creditor would be unable to benefit from the crop disaster payment because the payment is not included in the debtor estate. The conclusion of the majority creates "a

59

windfall merely by reason of the happenstance of bankruptcy." Lewis, 364 U.S. at 609, 81 S. Ct. at 350. According to the majority, because Bracewell decided to convert under Chapter 7 before the enactment of the legislation granting him relief, Bracewell both discharged his pre-bankruptcy debts to his creditors who provided capital for Bracewell's pre-bankruptcy crops and voided any security interests in the proceeds of the crops that the creditors otherwise might have enforced. Although the majority cautions that we should not seek to improve a statute under the guise of interpreting it, see Bracewell, slip op. at 12-14, nothing in the statutory text requires us to interpret "proceeds" in a way that is "so bizarre that Congress could not have intended it." Demarest v. Manspeaker, 498 U.S. 184, 190–91, 111 S. Ct. 599, 604 (1991).

To reach the conclusion that crop disaster payments are not proceeds of the debtor estate, the majority must ignore the text of the Georgia Code, the legislative history of the Bankruptcy Code, and the fundamental policy goals of secured transactions and bankruptcy. Under the guise of interpreting section 541(a)(6), the majority voids valid rights granted to creditors by Georgia law. See Bracewell, slip op. at 12-14. I must disagree with that conclusion.

Because I would reverse the decision of the district court, I respectfully dissent.