In re Gail H. GREEN, Debtor.

No. 06–50410–JDW.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Aug. 30, 2006.

Robert M. Matson, Macon, GA, for Debtor.

Thomas F. Bohan, Macon, GA, for Wells Fargo.

## MEMORANDUM OPINION

JAMES D. WALKER, JR., Bankruptcy Judge.

This matter comes before the Court on the objection of Wells Fargo Financial Georgia, Inc. to confirmation of Debtor's Chapter 13 plan. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(L). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Debtor Gail Green filed a Chapter 13 petition on March 14, 2006. On the petition date, Debtor owed Wells Fargo Financial Georgia, Inc. $14,513.27 for a 2002 Mercury Sable that she valued at $10,000. The contract rate for the purchase of the vehicle was 15.39%. In her modified Chapter 13 plan, Debtor proposed to pay Wells Fargo the full amount of its claim with no interest. Wells Fargo objected to confirmation of the plan, arguing that it was entitled to interest on the full amount of the claim. The parties stipulate that the amount of the claim is greater than the fair market value of the car plus interest calculated at the prime rate plus a risk factor. The parties further stipulate that Wells Fargo holds a purchase money security interest in the car and that the car was purchased within 910 days prior to the bankruptcy filing. The Court held a confirmation hearing on June 6, 2006, and for the following reasons, overrules Wells Fargo's objection.

### Conclusions of Law

#### Relevant Statutes

At issue in this case is whether a debtor must pay interest to a creditor whose collateral is a motor vehicle purchased by the debtor for personal use within 910 days prior to filing a bankruptcy petition. Pursuant to 11 U.S.C. § 1325(a)(5), a Chapter 13 plan must make the following provision for an "allowed secured claim" when the debtor retains the property securing the claim: "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]" 11 U.S.C. § 1325(a)(5)(B)(ii). The payment of interest ensures that the

creditor receives the present value of his claim.

Generally, the extent to which a claim is a secured claim, and thus entitled to interest in a Chapter 13 plan, is determined by 11 U.S.C. § 506, which is headed as "Determination of secured status," and provides in relevant part as follows:

(a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1).

However, a new provision of 11 U.S.C. § 1325(a), which was added as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), prevents application of § 506 to certain claims. Congress inserted the language as an unnumbered or "hanging" paragraph following § 1325(a)(9), providing as follows:

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a), hanging paragraph.

### Case Law

***Majority View.*** The hanging paragraph has been the subject of numerous published opinions, with a majority view emerging as to its interpretation. The majority holds that a claim of the type described in the hanging paragraph (a "910 claim") is deemed secured in the full amount of the claim.[1] Further, under § 1325(a)(5), the creditor is entitled to interest as calculated in accordance with *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004),[2] on the full amount of

---

1. See *In re Robinson*, 338 B.R. 70, 73 (Bankr. W.D.Mo.2006); *In re Horn*, 338 B.R. 110, 113 (Bankr.M.D.Ala.2006) (holding that the hanging paragraph did not apply to the claim at issue because it was not a purchase money security interest); *In re Brown*, 346 B.R. 868, 876 (Bankr.N.D.Fla.2006); *In re Wright*, 338 B.R. 917, 919–20 (Bankr.M.D.Ala.2006); *In re Parish*, No. 05–BK–15702-JAF, 2006 WL 1679710, at *1 (Bankr.M.D.Fla. May 12, 2006); *In re Ezell*, 338 B.R. 330, 340 (Bankr. E.D.Tenn.2006); *In re Fleming*, 339 B.R. 716, 722 (Bankr.E.D.Mo.2006); *In re Montoya*, 341 B.R. 41, 44 (Bankr.D.Utah 2006); *In re DeSardi*, 340 B.R. 790, 812–13 (Bankr.S.D.Texas 2006); *In re Shaw*, 341 B.R. 543, 546 (Bankr.M.D.N.C.2006); *In re Scruggs*, 342 B.R. 571, 574 (Bankr.E.D.Ark. 2006); *In re Brooks*, 344 B.R. 417, 421 (Bankr.E.D.N.C.2006); *In re Bufford*, 343 B.R. 827, 832–33 (Bankr.N.D.Texas 2006); *In re Soards*, 344 B.R. 829, 831 (Bankr.W.D.Ky. 2006); *In re Vega*, 344 B.R. 616, 620 (Bankr. D.Kan.2006); *In re Lowder*, No. 05–44802, 2006 WL 1794737, at *6 (Bankr.D.Kan. June 28, 2006); *In re Sparks*, 346 B.R. 767, 770–71 (Bankr.S.D.Ohio 2006); *In re Brown*, 339 B.R. 818, 821 (Bankr.S.D.Ga.2006); *In re Murray*, 346 B.R. 237, 243–44 (Bankr. M.D.Ga.2006) (Laney, J); *In re Brown*, 346 B.R. 246, 248–49 (Bankr.M.D.Ga.2006) (Hershner, C.J.).

2. In *Till*, the plurality adopted the formula approach, in which interest is calculated as the prime rate plus a risk factor. 541 U.S. at

the claim. Courts reaching this conclusion reason that nonbankruptcy law determines whether a claim is secured while bankruptcy law determines the value of the secured claim. *In re Brown,* 339 B.R. 818, 821 (Bankr.S.D.Ga.2006) (Dalis, J.); *In re Murray,* 346 B.R. 237, 243–44 (Bankr. M.D.Ga.2006) (Laney, J.); *In re Brown,* No 06–50193–RFH, 346 B.R. 246, 248–49 (Bankr.M.D.Ga.2006) (Hershner, C.J.) (adopting the legal conclusions set forth in *Murray*).

In *Brown,* Judge Dalis rejected the debtors' argument that § 506 defines secured claims. 339 B.R. at 821. In doing so, he relied on *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992)-which considered the relationship between § 506(a) and the term "allowed secured claim" in § 506(d). 339 B.R. at 821. In *Dewsnup,* the Court, summarizing one party's argument, said:

> [T]he words "allowed secured claim" in § 506(d) need not be read as an indivisible term of art defined by reference to § 506(a), which by its terms is not a definitional provision. Rather, the words should be read term-by-term to refer to any claim that is, first, allowed, and, second, secured.

502 U.S. at 415, 112 S.Ct. at 777. Judge Dalis drew upon this passage to conclude that the function of § 506(a), is the "bifurcation of an allowed claim ... into secured and unsecured portions in contravention of nonbankruptcy law, nothing more." 339 B.R. at 821. If a claim is subject to a lien as defined by § 101(37), then it is secured, according to Judge Dalis. *Id.* Because the 910 claim is fully secured and because

§ 1322(b)(2) [3] allows modification of the rights of most secured creditors, Judge Dalis concluded that interest on the full amount of the claim should be paid and calculated pursuant to *Till. Id.* at 822.

In *Murray,* Judge Laney agreed with the conclusion in *Brown* for largely the same reasons given by Judge Dalis. 346 B.R. 237, 241–44. Judge Laney offered further support for the conclusion by reference to legislative history. *Id.* at 243–44. Judge Laney specifically pointed to portions of the Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256 (which was enacted as BAPCPA). *Id.* In a section discussing highlights of BAPCPA, the Report stated that the Act's "protections for secured creditors include a prohibition against bifurcating a secured debt incurred within the 910–day period preceding the filing of a bankruptcy case if the debt is secured by a purchase money security interest in a motor vehicle acquired for the debtor's personal use." H.R.Rep. No. 109–31, Pt. 1, at 17 (2005), *reprinted in* E–2 Collier on Bankruptcy Pt. 10(b) (15th ed. rev'd 2006). Judge Laney also noted that the "Dissenting Views" section of the Report similarly stated as follows:

> The legislation would also largely eliminate the possibility of loan bifurcations in chapter 13 cases. Under current law a debtor is permitted to bifurcate a loan between the secured and unsecured portions. The debt is treated as a secured debt up to the allowed value of the property securing the debt. The remainder of the debt is treated as a non-priority unsecured debt. Section 306 of

478–79, 124 S.Ct. at 1961. This is commonly known as *Till* interest.

**3.** "Subject to subsections (a) and (c) of this section, the plan may ... (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in

real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]" 11 U.S.C. § 1322(b)(2).

the legislation prevents such bifurcations (including with regard to interest and penalty provisions) with respect to any loan for the purchase of a vehicle in the 910 days before bankruptcy . . . .

*Id.* at 554.[4]

Judge Laney also concluded that 910 claims are entitled to interest as set forth in *Till.* 346 B.R. at 244–45. Because BAPCPA provided no safe harbor from modification of the 910 creditors' rights, it did not overrule *Till,* nor did it make any other provision for interest on 910 claims. *Id.* Furthermore, the legislative history makes no mention of an intent to overturn *Till* with respect to 910 claims. *Id.*

*Minority Views.* In a case decided in the Southern District of Georgia, I took a different approach and held that a 910 claim is not a secured claim, reasoning that the only way a claim may be deemed secured for bankruptcy purposes is to be designated as such via § 506. *In re Carver,* 338 B.R. 521, 526 (Bankr.S.D.Ga.2006) (Walker, J.). Nevertheless, I concluded that Congress did not intend to punish creditors with 910 claims. *Id.* at 527. As such, they should not receive less than they would have received under the prior law. *Id.* at 528. Consequently, I set forth a formula for payment of such a claim: "[A] 910 claim must receive the *greater* of (1) the full amount of the claim without interest; or (2) the amount the creditor would receive if the claim were bifurcated and crammed down[.]" *Id.* (footnote omitted).

Although no subsequent decisions have agreed with me as to the payment of a 910 claim, two other cases have concluded that a 910 claim is not a fully secured claim. In *In re Wampler,* 345 B.R. 730 (Bankr. D.Kan.2006), the court adopted the view set forth in Collier on Bankruptcy that a 910 claim is not secured and, therefore, is not entitled to any interest.[5] *Id.* at 735. The court noted that the interest provision in § 1325(a)(5) applies only to allowed secured claims. *Id.* at 736. "The provisions of §§ 502 and 506, read together, establish the only means by which a court may determine that an allowed claim should be allowed as a secured claim." *Id.* Because the hanging paragraph expressly excludes application of § 506 to 910 claims, they cannot be allowed secured claims subject to treatment under § 1325(a)(5). *Id.* Citing Collier, the court concluded that even if Congress intended 910 claims to be fully secured, such an interpretation of the hanging paragraph is at odds with its text and must be rejected. *Id.* at 736–37.

The court in *Wampler* went on to criticize the *Brown* case for its reliance on *Dewsnup v. Timm. Id.* at 737–38. According to *Brown,* an allowed secured claim is one subject to a lien, not a claim that has been bifurcated pursuant to § 506. *Id.* at 737. Thus, because § 1325(a)(5) requires that allowed secured claims be paid in full, "Chapter 13 debtors would be required to pay through their plan for every secured creditor its entire claim, both the secured and unsecured portions . . . ." *Id.* at 739. As a consequence, defining a secured claim by reference to state law rather than by reference to § 506 renders the language in

---

**4.** A different passage in the "Dissenting Views" section of the House Report offers more explicit support for the majority position that a 910 claim is a fully secured claim: "By prohibiting bifurcation, a lender with a secured loan that is underwater would be unjustly enriched by being able to treat the unsecured portion of that loan as fully se-

cured to the detriment of other unsecured creditors." H.R.Rep. No. 109–31, Pt. 1, at 564 (2005), *reprinted in* E–2 Collier on Bankruptcy Pt. 10(b) (15th ed. rev'd 2006).

**5.** *Wampler* has been appealed to the Tenth Circuit Court of Appeals, No. 06–3725.

the hanging paragraph meaningless because it would do nothing more than provide treatment to 910 claims that such claims are already entitled to receive (payment in full irrespective of bifurcation). *Id.*

> Section 506 is not a definitional provision, but a substantive one that provides the only mechanism, within the confines of the Code, wherein an allowed secured claim is determined. State law may define and create property interests, but it is the function of the Code to determine their treatment in bankruptcy. The *Brown* decision in effect abdicates this fundamental role to state law.

*Id.* Because treatment under § 1325(a)(5), including payment of interest, applies only to bifurcated claims and the hanging paragraph prevents application of § 506 to 910 claims, such claims are not entitled interest, the court concluded. *Id.* at 739–40.

The court in *In re Taranto*, 344 B.R. 857 (Bankr.N.D.Ohio 2006), concluded that a 910 claim is not a secured claim because § 506 is the sole means for determining whether or not a claim is secured. *Id.* at 860. "The challenge for courts seeking to interpret the 910 Provision is the *ouroboros* effect.[6] For a claimant to have the benefits of § 1325(a)(5), it must hold an allowed secured claim. Under the Bankruptcy Code, one holds an allowed secured claim only through operation of § 506. The 910 Provision specifically excludes the application of § 506." *Id.* at 861. Absent application of § 1325(a)(5), the court considered whether 910 claims are entitled to interest. *Id.* at 861–62. Because interest is not addressed by the hanging paragraph, the court concluded that the question must be decided on a case-by-case basis with an emphasis on whether the 910

creditor receives fair treatment under the plan. *Id.* at 863.

In *Taranto*, the contract to purchase the car provided for the debt to be repaid over 72 months at 0% interest. The Chapter 13 plan proposed to pay the debt in full with no interest. Payments would be completed three years ahead of the contract schedule. In addition, the plan provided a 45% dividend to general unsecured creditors. *Id.* at 858. To allow the 910 creditor interest in such circumstances would offer it preferential rather than fair treatment while unfairly diminishing the dividend to unsecured creditors. *Id.* at 862–63. Consequently, the court decided the creditor was not entitled to interest. *Id.* at 863.

### Discussion

■ While the issue of 910 claims has in a short amount of time generated a good deal of case law, none of it is binding authority. My conclusion in *Carver*, which was one of the earliest cases to weigh in on this issue, has been rejected by most subsequent decisions. Nevertheless, I continue to believe that *Carver* is correctly decided. While I may disagree with the analysis presented in the subsequent cases, they show a careful consideration for the questions presented by the hanging paragraph. Consequently, as I revisit this issue, I must reach a principled answer while considering the role nonbinding adverse authority should have in rendering a decision.

■ With regard to the hanging paragraph, the Court is faced with an anomaly in that certain creditors among a class of creditors are singled out for different treatment. I have to discern whether the anomaly was intended. Because this case turns on a question of statutory interpreta-

---

**6.** "The Ouroboros (also spelled Oroborus, Uroboros, Uroborus) is an ancient symbol depicting a serpent or dragon swallowing its own tail." 344 B.R. at 861, n. 5.

tion, any analysis must begin with the language of the statute at issue. "It is well established that 'when the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms.'" *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000)). Furthermore, the fact that "a statute is awkward or ungrammatical does not necessarily render it ambiguous and incapable of a plain-language interpretation." [7] *Id.* Thus, a judge's duty is to interpret a clear provision of the Bankruptcy Code according to its terms, without regard to any policy or purpose the judge may perceive as underlying the provision. The Eleventh Circuit Court of Appeals recently emphasized the point as it applies to the Bankruptcy Code. "If, in the face of plain statutory language, an opinion runs on about purposes and policies, it is a sure sign the revision knife is out and an effort is being made to slice and dice clear language to make way for the policy preferences of the writer." *Bracewell v. Kelley (In re Bracewell)*, 454 F.3d 1234, 1241 (11th Cir.2006). "[W]e are not commissioned to cure problems in the operation of statutory schemes Congress has designed.... If there are problems with the way a statute operates, Congress can alter the statute to eliminate those problems; we cannot." *Id.* at 1246.

Prior to the enactment of BAPCPA, the bankruptcy courts and judges charged with interpreting bankruptcy law had been fortunate beneficiaries of a coherent, carefully crafted system of principles that work together in a logical way to yield predictable results. For the most part since 1978, amendments to the Bankruptcy Code have been designed to fit into this logical scheme. BAPCPA, on the other hand, confounds this scheme with additions such as the hanging paragraph to § 1325(a). Its illogical effect can be demonstrated by trying to determine whether a 910 claim can be paid in full if the lien securing the indebtedness is nonexistent, defective, or avoided pursuant to another section of the Bankruptcy Code.[8]

In the case of secured creditors, we start with a claim that may be secured under state law, meaning the creditor has recourse to collateral for satisfaction of the debt. In bankruptcy, that "secured claim"

---

7. For example, in *Carver* I noted that the hanging paragraph is missing the word "period" in its first sentence when it refers to the "910–day [sic] preceding the date of the filing of the petition." 338 B.R. at 523 (citing Dianne C. Kerns, *Cram-a-lot: The Quest Continues*, 24–Nov. Am. Bankr.Inst. J. 10, 10 (2005)). That omission has not changed the meaning of time period covered by the hanging paragraph.

8. The fact that the hanging paragraph applies to purchase money security interests in vehicles raises a separate set of provocative questions. One of the characteristics of a PMSI is that it is self-perfecting upon attachment. O.C.G.A. § 11–9–309(1) (2002). A security interest in an automobile, on the other hand, must be perfected by noting the lien on the vehicle's title. O.C.G.A. § 40–3–50 (2004). That type of perfection may be subject to avoidance in bankruptcy in certain circumstances. It is possible Congress intended to use "purchase money security interest" in an imprecise conversational sense to mean any creditor that loaned the money to purchase the automobile. If that is the case, what happens if the trustee successfully avoids the perfection of the car creditor's security interest? Will that creditor still have a 910 claim that would be treated as fully secured or would the treatment preference provided by the hanging paragraph be lost, even though perfection is not an element of the 910 claim definition in the hanging paragraph? Compelling as these questions are, they only serve to further demonstrate the drafting flaws in BAPCPA.

starts off like all other claims: under § 101(5)(A) as a "right to payment, whether or not such right is . . . secured, or unsecured[.]" The further classification of the debt as a claim is determined under § 506, aptly titled, "Determination of secured status." Section 506(a) provides that an allowed claim secured by a lien on property is a secured claim to the extent of the value of the creditor's interest. The balance of the claim is defined as an unsecured claim. The Bankruptcy Code contains no other provision for whether a claim is "secured" in a bankruptcy case.

The decisions in *Brown* and *Murray*, which reach a contrary conclusion, are both distracted by the *Dewsnup* case. However, nothing in *Dewsnup* supports their conclusion that a secured claim in bankruptcy is defined by nonbankruptcy law. *Dewsnup* was a Chapter 7 case in which the Supreme Court declined to allow the debtor to strip down the mortgage of an undersecured creditor. 502 U.S. at 417, 112 S.Ct. at 778. Instead, the Court held that the creditor's lien passed through bankruptcy. *Id.* The Court expressly limited its holding in *Dewsnup* to the facts of the case-a Chapter 7 case in which the creditor was secured by real property. *Id.*

> Hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute [§ 506] in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day.

*Id.* at 416–17, 112 S.Ct. at 778. The Court was particularly concerned that the creditor would lose the benefit of any appreciation in value of the collateral. *Id.* at 417, 112 S.Ct. at 778. Such a concern does not apply when the collateral is an automobile, which is almost certain to depreciate in value. In addition, the Court turned to pre-Code practice, which it found allowed liens to pass through bankruptcy unaffected, to reach its conclusion. *Id.* at 418, 112 S.Ct. at 778. In Chapter 13, there is no similar need to rely on pre-Code practice because § 1322(b)(2) expressly allows the Chapter 13 plan to "modify the rights of holders of secured claims."

In a Chapter 13 bankruptcy reorganization, the stripping of liens is followed by an equitable distribution of assets. With no distribution, there would be no purpose in bifurcating the claim between secured and unsecured. *Dewsnup* was a no-asset Chapter 7 case. As a result, there was no distribution to creditors and consequently no bankruptcy purpose in valuing the collateral and bifurcating the claim. There is a purpose in Chapter 13 for bifurcating claims because the debtor must propose to pay secured creditors the value of their collateral if the property is to be retained by the debtor. Also, the general unsecured creditors may be paid a portion of their claims. The undersecured portion of a secured claim becomes an unsecured claim and participates pro rata in this distribution with the other unsecured creditors. For these reasons, I am unpersuaded that *Dewsnup* compels a different conclusion than I reached in *Carver*.

In addition to this misplaced reliance on *Dewsnup*, many opinions (as well as lectures and other analyses of the hanging paragraph) are replete with references to clear legislative intent. I am confused about where that intent was ascertained, if not from the text. The judicial inquiry I have seen on legislative intent seems awkward at best, relying on what most courts admit is extremely scanty legislative history.

The courts urging the majority view have pointed to two specific sources as

legislative history. First, is the language of the bill enacted into law. The hanging paragraph was organized under the caption, "Giving Secured Creditors Fair Treatment in Chapter 13 ... (b) Restoring the Foundation for Secured Debt." Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, S. 256, 109th Cong. § 306 (2005). The cases do not address why, if Congress intended "fair" treatment, they have interpreted the hanging paragraph to give preferential treatment to a narrow category of creditors by giving those creditors a secured claim on nonexistent value.

The second source cited by courts is the Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256. H.R.Rep. No. 109–31, Pt. 1 (2005), *reprinted in* E–2 Collier on Bankruptcy Pt. 10(b) (15th ed. rev'd 2006). The Report makes the following statements:

> S. 256's protections for secured creditors include a prohibition against bifurcating a secured debt incurred within the 910–day period preceding the filing of a bankruptcy case if the debt is secured by a purchase money security interest in a motor vehicle acquired for the debtor's personal use.

*Id.* at 17.

> Section 306(b) adds a new paragraph to section 1325(a) of the Bankruptcy Code specifying that Bankruptcy Code section 506 does not apply to a debt incurred within the two and one-half year period preceding the filing of the bankruptcy case if the debt is secured by a purchase money security interest in a motor vehicle acquired for the personal use of the debtor within 910 days preceding the filing of the petition.

*Id.* at 72. Neither of these passages does any more to enlighten me about legislative intent than the text of the hanging paragraph; they simply paraphrase the statute. It is clear that Congress intended to prevent bifurcation of certain claims, as the hanging paragraph states. But, the passages provide no illumination as to the consequences bypassing § 506.

The "Dissenting Views" section of the Report offers this explanation of the consequences: "By prohibiting bifurcation, a lender with a secured loan that is underwater would be unjustly enriched by being able to treat the unsecured portion of that loan as fully secured to the detriment of other unsecured creditors." *Id.* at 564. This emphasizes the unfairness to unsecured creditors. However, it is hard to find any guidance in the dissenting views when it uses language ("fully secured") that is never used by the proponents of the bill and that is conspicuously absent from the text. If Congress intended 910 claims to be fully secured, why rely on the guidance provided by opponents of the legislation to make that point? Furthermore, even the dissenting views leave open the question as to the payment of interest. The reference to "fully secured" could mean, as the majority claims, that the claim is treated as having passed around § 506 and been determined to be fully secured and entitled to interest under § 1325(a)(5). Or, it could mean "fully secured" in a conversational sense to indicate that the creditor is entitled to full payment on the entire claim without interest regardless of the value of the collateral.

Even if I could discern some clarity of legislative intent from the dissenting views, it would seem almost absurd to rely on such a peripheral portion of the legislative history. If primary sources are silent or nonexistent-for example, Congress produced no conference report for BAPCPA-looking to remote sources that offer no consensus of opinion as to legislative intent is not helpful. For these reasons, I decline to believe any judge should be com-

pelled to rely on the interpretation of opponents of the legislation as a reliable indicator of the legislative intent.[9]

It is equally dubious to go back to comments and history from prior years when the legislation was not enacted.[10] Those in the bankruptcy field have followed the development of BAPCPA over the course of 8 years. During that time, we have been exposed to multiple prior versions of the legislation, congressional hearings, debates, law review articles and seminars offering analysis, even newspaper editorials, all weighing in at various stages in the process. Collectively, these sources compose part of the overall fabric of understanding serving as the backdrop for interpretation of BAPCPA's provisions. This exposure can lead us to draw conclusions about legislative intent even though none of the sources were produced by Congress with respect to the bill actually enacted. See Wampler, 345 B.R. at 740. For these reasons, I find nothing helpful in the legislative history for discerning legislative intent or otherwise interpreting the hanging paragraph. I can find nothing to guide me to the conclusion that a 910 claim was meant to receive interest.

I decline to adopt the conclusion that a 910 claim is a secured claim and continue to hold that § 506 is the one and only path to the establishment of a secured claim for bankruptcy purposes. Until I am directed either judicially or legislatively to the conclusion that determination of secured status happens somewhere other than § 506, I will continue to grasp what logic remains in the Code that a secured claim is created in the one section of the Code whose title and provisions specifically address the creation of such a status.

Much has been written about the way to determine interest rates on secured claims under *Till*, but the unstated foundation of the logic in *Till* historically has been collateral value. In other words, the treatment of a secured claim has been founded on the logic that a creditor outside bankruptcy could immediately enjoy the present cash value of the collateral by repossession and liquidation. See Taranto, 344 B.R. at 861–62. Unsecured claims have never received interest in bankruptcy cases except in rare circumstances when assets in the case exceed the amount of all claims, even unsecured claims. Even that circumstance is founded on an assumption that all creditors would receive immediate cash in a nonbankruptcy liquidation. As this dem-

---

9. It can be difficult to gauge the reliability of any legislative history. In *Hamdan v. Rumsfeld*, —— U.S. ——, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), the Supreme Court considered whether the Detainee Treatment Act stripped courts of jurisdiction over habeas corpus petitions pending at the time of enactment or only over subsequently filed petitions. *Id.* at 2763–64. Justice Stevens rejected a colloquy by Senators Graham and Kyl that supported application of the law to pending cases because "those statements appear to have been inserted into the Congressional Record *after* the Senate debate." *Id.* at 2766 n. 10. On the other hand, all the statements made during the debate supported the opposite position. *Id. Hamdan* demonstrates the ease with which the legislative history can be manipulated.

10. In *Carver*, I examined multiple prior unenacted versions of the hanging paragraph and § 506, including proposed language to § 506 that would have required certain collateral to be valued as the balance due on the debt. 338 B.R. at 525–26 (citing Bankruptcy Reform Act of 1998, H.R. 3150, 105th Cong. § 128 (1998)). I concluded this legislative history could support the view that "'[t]he fact that Congress considered but rejected legislation' that would have given 910 claim[s] fully secured status supports the conclusion that it did not intend 910 claims to be treated as secured claims under a Chapter 13 plan." *Id.* at 526 (quoting *Till v. SCS Credit Corp.*, 541 U.S. 465, 480 n. 19, 124 S.Ct. 1951, 1962 n. 19, 158 L.Ed.2d 787 (2004)).

onstrates, there is no logical foundation for giving a creditor interest on that portion of his claim that exceeds the value of the collateral. Not only is the logic for such a result missing, so is any language in the text of the statute providing for that result. The conclusion of the majority that some creditors should receive interest on nonexistent value serves to cast a long shadow across any hope of logical and consistent interpretation of the various provisions of the Bankruptcy Code. Unquestionably, Congress can create such a new statutory scheme. If that was intended by BAPCPA, the words of the statute should give an unequivocal indication of that intent. No such intent is stated in the Code. Courts finding such an intent are compelled to characterize ambiguous sources of legislative history as a reliable statements of legislative intent.

As for the rate of interest and application of *Till*, the Court notes that *Till* does not reference any nonbankruptcy alternative. In other words, interest as determined by *Till* is founded on the assumption that the secured claim would already be established and the interest would compensate the creditor for being denied the present value derived from the liquidation of collateral. The undersecured 910 claim will not be paid in full in a Chapter 7, nor will the full value of the claim ever be realized by the creditor in a state court liquidation proceeding unless the deficiency can be paid together with all other unsecured debts. The 910 claim status is a unique benefit conferred for the first time in the 2005 amendments to the Code. There is no logical way to determine the risk of loss of a value that in itself is a completely fictionalized creation of the Bankruptcy Code. In the past, when interest rates were related to a nonbankruptcy reality, there was an economic reference point. With respect to 910 claims, the Court has no way to determine the risk of loss of a benefit that would not exist except for the bankruptcy filing.

■ Because I have already concluded that 910 claims are not secured claims entitled to treatment-and interest-under § 1325(a)(5), and because Congress has provided no statutory treatment for such claims, I must determine how such claims should be paid.[11] In an effort to give recognition to the only clearly stated legislative intent-that 910 creditors should be given fair treatment-*Carver* established an analogy that respected the logical structure of the Code as to secured claims and the payment of interest while at the same time providing the "fair treatment" to a certain class of creditors that was created by the hanging paragraph. 338 B.R. at 527–28. After careful consideration, I continue to believe *Carver* is correctly decided and continue to hold as follows: In a Chapter 13 plan, a 910 claim must receive the greater of (1) the full amount of the claim without interest; or (2) the amount the creditor would receive if the claim were bifurcated and crammed down with *Till* interest paid on the value of the collateral.

### Conclusion

Based on the foregoing, I will continue to follow my decision in *Carver*. It would be more convenient to follow the consensus of opinion if I could do so in good con-

---

**11.** *Carver* has been characterized as a decision that does not recognize the anti-bifurcation intention expressed in the hanging paragraph. *See In re DeSardi*, 340 B.R. 790, 812 (Bankr.S.D.Texas 2006). Consider that *Carver* compels the payment of a 910 claim in full, without regard to the value of the collateral and *without bifurcation*. The result in *Carver* compels payment of *at least* the full amount of the claim, and more, if necessary to avoid unfairness.

science, but I do not believe the majority view correctly follows established principles of statutory construction. Before one can come to the conclusion espoused by the majority, there must be plain language in the text compelling such a conclusion. Repeated references to the intention of Congress in the majority of cases are a clear indication to me that the necessary statement of congressional intention is absent from the words of the statute.

In this case, the parties have stipulated that the treatment proposed by Debtor-payment of the claim in full with no interest-will provide a greater distribution to Wells Fargo than a cram down would pay. Therefore, I find that Debtor's plan con-forms to my holding and will overrule the objection of Wells Fargo.

An Order in accordance with this Opinion will be entered on this date.

## ORDER

In accordance with the Memorandum Opinion entered on this date, the Court hereby OVERRULES the objection of Wells Fargo Financial Georgia, Inc. to confirmation of Debtor's Chapter 13 plan.